**Charles J. Paternoster, OSB No. 024186**
CPaternoster@pfglaw.com
**PATERNOSTER, FARNELL & GREIN, LLP**
1030 S.W. Morrison Street
Portland, OR 97205
Telephone: (503) 222-1812
*Attorneys for Plaintiff Benjamin Lapin*
*Additional Counsel of Record Listed on Signature Page*

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

| | |
|---|---|
| BENJAMIN LAPIN, derivatively on behalf of NIKE, INC.,<br><br>                    Plaintiffs,<br><br>        v.<br><br>JOHN DONAHOE II, MATTHEW FRIEND, CATHLEEN BENKO, JOHN G. CONNORS, TIMOTHY COOK, THASUNDA DUCKETT, MONICA GIL, ALAN B. GRAF, JR., MARIA HENRY, PETER HENRY, TRAVIS KNIGHT, MARK PARKER, MICHELLE PELUSO, JOHN ROGERS, JR., and ROBERT SWAN,<br><br>                    Defendants,<br><br>        -and-<br><br>NIKE, INC., an Oregon Corporation,<br><br>                    Nominal Defendant. | Case No.<br><br>**VERIFIED DERIVATIVE COMPLAINT**<br><br>**(Derivative Action, Breach of Fiduciary Duty)**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Benjamin Lapin ("Plaintiff"), by his undersigned attorneys, brings the following

Complaint on behalf of NIKE, Inc. ("NIKE" or the "Company") against the Company's board of

directors (the "Board") and executive officers for breaches of fiduciary duties and violation of

PATERNOSTER FARNELL & GREIN, LLP
Attorneys at Law
1030 SW Morrison Street
Portland, OR 97205
Telephone: (503) 222-1812  FAX: (503) 274-7979

Section 14(a) of the Securities Exchange Act of 1934. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) pleadings filed in *In re Nike Inc. Securities Litigation*, Case No. 3:24-cv-00974-AN (D.Or.); (iii) corporate governance documents available on the Company's website; and (iv) other publicly available information.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff, a stockholder of NIKE, on behalf of the Company against the Defendants. This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least March 19, 2021, to December 21, 2023. During that time the Defendants (as defined herein) caused or allowed NIKE to issue or make materially false and misleading statements concerning the Company's financial condition and business operations. Additionally, the Defendants caused or allowed NIKE to file false and misleading statements with the SEC.

2.      In 2017, NIKE announced that it would begin to invest more in its direct-to-consumer sales. A few years later, in 2020, NIKE announced its Consumer Direct Acceleration strategy to support the growth of digital sales directly to consumers. The Consumer Direct Acceleration strategy focused on increasing digital sales, and at the same time reduce NIKE's wholesale business.

3.      From March 19, 2021, through December 21, 2023, NIKE and its executive officers touted the success of the direct-to-consumer business, as well as the growth of the digital business. The direct-to-consumer business, dubbed NIKE Direct, was expected to provide sustainable, long-term growth. The Company forecasted that the shift from wholesale to direct-to-consumer would

**PAGE 2 – VERIFIED DERIVATIVE COMPLAINT**

significantly increase the Company's gross margins.

4.      Beginning on December 21, 2023, the Company revealed that this was not the case. Gross margin began to decrease, as did revenues attributed to digital sales and NIKE Direct. The Company disclosed that it would need to return to wholesale partners it had walked away from in 2021. By June 27, 2024, the Company revealed that it would begin reducing the products available to purchase via the digital business.

5.      These revelations caused dramatic declines in NIKE's Class B common stock price, most notably an almost 20% decline from a closing price of $94.19 per share on June 27, 2024, to a closing price of $75.37 per share on June 28, 2024. Investors brought class action lawsuits against the Company and two of its executives, consolidated as *In re Nike Inc. Securities Litigation*, Case No. 3:24-cv-00974-AN (D.Or.). Analysts questioned the long-term health of the Company, and criticized NIKE's management for trying to "sell a story of improvement to investors" that it could not support based on the financial results.

6.      Through this action, Plaintiff seeks to hold the Board and certain executive officers accountable for making or causing the Company to make false and misleading statements in breach of their fiduciary duties to the Company and in violation of the federal securities laws.

**PARTIES**

A.      **Plaintiff.**

7.      Plaintiff Ben Lapin is a current shareholder of NIKE and has held NIKE stock during all times relevant hereto and is committed to hold shares through the pendency of this action to preserve his standing. Plaintiff will adequately and fairly represent the interests of NIKE and its shareholders in enforcing its rights.

PATERNOSTER FARNELL & GREIN, LLP
Attorneys at Law
1030 SW Morrison Street
Portland, OR 97205
Telephone: (503) 222-1812  FAX: (503) 274-7979

**B.      Nominal Defendant.**

8.      Nominal Defendant NIKE is a corporation organized and existing under the laws of the State of Oregon. The Company's principal executive offices are located at One Bowerman Drive, Beaverton, Oregon 97005-6453. NIKE Class B Common Stock trades on the New York Stock Exchange under the ticker symbol "NKE."

**C.      Individual Defendants.**

9.      Defendant John Donahoe II has been a director of the Company since 2014 and has served as President and CEO since 2020.

10.      Defendant Cathleen Benko has been a director of the Company since 2018. Defendant Benko served on the Audit & Finance Committee from January 1, 2022, until October 6, 2022.

11.      Defendant John G. Connors served as a director of the Company from 2005 to 2021. Defendant Connors served on the Audit & Finance Committee in 2021.

12.      Defendant Timothy Cook has been a director of the Company since 2005. Defendant Cook serves as lead independent director.

13.      Defendant Thasunda Duckett has been a director of the Company since 2019.

14.      Defendant Monica Gil has been a director of the Company since 2022.

15.      Defendant Alan B. Graf, Jr. served as a director of the Company from 2002 until September 10, 2024. Defendant Graf served on the Audit & Finance Committee until July 31, 2024.

16.      Defendant Maria Henry has been a director of the Company since 2023. Defendant M. Henry serves on the Audi & Finance Committee.

17.      Defendant Peter Henry has been a director of the Company since 2018. Defendant

PATERNOSTER FARNELL & GREIN, LLP
Attorneys at Law
1030 SW Morrison Street
Portland, OR 97205
Telephone: (503) 222-1812  FAX: (503) 274-7979

P. Henry serves on the Audit & Finance Committee.

18.    Defendant Travis Knight has been a director of the Company since 2015. Defendant Knight is the son of Nike's co-founder, Philip Knight, who serves as Chairman Emeritus. Defendant Knight also has a significant role in the management of the Class A stock owned by Swoosh, LLC.

19.    Defendant Mark Parker has been a director of the Company since 2006.  Defendant Parker currently serves as Executive Chairman. Previously, Defendant Parker served as President and CEO of NIKE from 2006 to 2020 and has been employed by NIKE since 1979.

20.    Defendant Michelle Peluso has been a director of the Company since 2014.

21.    Defendant John Rogers, Jr. has been a director of the Company since 2018.

22.    Defendant Robert Swan has been a director of the Company since 2022. Defendant Swan serves on the Audit & Finance Committee.

23.    Defendants Donahoe, Benko, Connors, Cook, Duckett, Gil, Graf, M. Henry, P. Henry, Knight, Parker, Peluso, Rogers, and Swan are herein referred to as "Director Defendants."

24.    Defendant Matthew Friend has served as Executive Vice President and Chief Financial Officer of the Company since 2020.

25.    Defendants Donahoe and Friend are herein referred to as "Officer Defendants."

## JURISDICTION AND VENUE

26.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of Section 14 of the Securities Exchange Act of 1934.

27.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

28.    Personal jurisdiction exists over each Defendant either because the Defendant

**PAGE 5 – VERIFIED DERIVATIVE COMPLAINT**

conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

29.     Venue is proper in this court under 28 U.S.C. § 1391, because NIKE is incorporated and headquartered in this District, and a significant amount of the conduct at issue took place and had an effect in this District.

<b><u>FURTHER SUBSTANTIVE ALLEGATIONS</u></b>

**A.      Company Background.**

30.     Since 1967, NIKE has designed and sold athletic footwear. NIKE became a household NIKE after the Company signed Michael Jordan, then a rookie player in the National Basketball Association, to promote a basketball shoe called the Air Jordan.  Originally expected to bring in $3 million over three years, NIKE saw sales of $70 million in the first two months after Air Jordans launched in 1985. Since then, NIKE has branched out to design and sell apparel, accessories, and equipment, in addition to athletic shoes like Air Jordans.

31.     NIKE began to transition away from its traditional wholesale model in 2017, deciding to focus on direct-to-consumer sales. The Company began reporting NIKE retail store sales and digital sales made directly to the consumer as "NIKE Direct." In 2020, NIKE announced its Consumer Direct Acceleration strategy, which included investments in data and analytics, logistics, and inventory management to support the growth of digital sales directly to consumers. The Company's goal was to have digital sales make up half of NIKE's business. The move away from wholesale intensified, and by 2022 NIKE had reduced its wholesale accounts by 50%. Companies like Designer Shoe Warehouse and Macy's were no longer part of NIKE's network.

PATERNOSTER FARNELL & GREIN, LLP
Attorneys at Law
1030 SW Morrison Street
Portland, OR 97205
Telephone: (503) 222-1812  FAX: (503) 274-7979

Moving away from wholesale and towards direct-to-consumer was forecasted to increase the Company's gross margins significantly.

**B.      NIKE's False and Misleading Statements.**

32.      On March 18, 2021, NIKE released its financial results for the third quarter for fiscal year 2021 via a Form 8-K filed with the SEC. The Company announced NIKE Direct sales of $4.0 billion, up 20 percent, while NIKE Brand digital sales increased 59 percent. Gross margin increased 130 basis points to 45.6 percent. "Our strategy is working, as we accelerate innovation and create the seamless, premium marketplace of the future," stated Defendant Donahoe. "We continue to see the value of a more direct, digitally enabled strategy, fueling even greater potential for NIKE over the long term," stated Defendant Friend. Revenue declines for NIKE Brand were attributed to mandatory store closures in Europe and delays in delivering inventory to wholesale partners in North America.

33.      The Company held a call with investors and analysts that day. During his prepared remarks, Defendant Donahoe stated:

> We've had tremendous success in digital, quickly pivoting to serve consumers as they shift to digital channels. But even as this consumer shift is felt across industries, NIKE's digital transformation remains a unique advantage. Scale matters. The strength of our brand allows us to stay personal, at scale, with consumers in all of our geographies, and more than ever, the portfolio effect of being a truly global brand is powerful.
>
> *      *      *
>
> The last thing I'd like to discuss is digital. We're taking even greater advantage of our vast digital opportunity as we create the future of retail. We know that our consumers want a consistent, seamless, and premium experience. And so alongside our strategic partners, we continue to consolidate the marketplace to give our consumers that premium experience. Our owned digital business is thriving, with growth of 54% on a currency-neutral basis during the quarter. This growth was led by North America, which had its first-ever quarter with $1 billion in digital revenue.

**PAGE 7 – VERIFIED DERIVATIVE COMPLAINT**

As you know, we set a bold vision for digital across owned and operated and partnered being 50% of our business in the long-term. We have made significant progress to-date, increasing the digital mix of our business by more than 10 points in Q3 versus the prior year.

NIKE's ability to sustainably grow digital for the long-term is rooted in our member connections and compelling experiences that only NIKE can offer. And our members are more engaged than ever with an over 60% increase in monthly engaged users for the quarter led by our SNKRS App, where we're seeing four times the engagement in monthly active users versus last year.

This heightened engagement is translating into buying. We're seeing continued member growth outpace total digital growth as buying members increased 80% versus the prior year, and these connections extend beyond digital. In our owned stores, member demand penetration rates are seeing meaningful increases, enabled by robust store training programs, member-specific promotions, and enhanced account linking capabilities. This is critical as we strategically focus on better serving and driving repeat engagement with active high-value members across all of our channels.

34.   In his prepared remarks, Defendant Friend stated:

[T]his quarter demonstrated how a more direct, digitally-enabled NIKE will fuel long-term strategic and financial value. Our Consumer Direct Acceleration strategy is driving a meaningful and broader marketplace shift and it is transforming our financial model. Our own digital business has grown more than 70% year-to-date and our mix of owned and partner digital now exceeds 35% of our total business.

This quarter, we increased member buying frequency and grew retained buying members versus the prior year and the prior quarter. Looking ahead to fiscal 2022 and beyond, we expect digital to continue to be our fastest-growing marketplace channel, with digital mix increasing towards our 50% vision.

NIKE physical stores are another key enabler to drive our Consumer Direct Acceleration, and our mono-brand store expansion strategy creates an incremental market opportunity for NIKE. New retail concepts such as Live, Rise, and Unite: will create distinctive, authentic, and premium NIKE consumer experiences in the marketplace. They will accelerate NIKE member acquisition at scale, while unlocking higher retail productivity. They will recapture displaced consumer demand as we restructure the wholesale marketplace with our strategic partners. And most importantly, they will accelerate NIKE Digital growth by scaling online to offline capabilities as our physical presence reaches a greater number of consumers.

\*        \*        \*

**PAGE 8 – VERIFIED DERIVATIVE COMPLAINT**

PATERNOSTER FARNELL & GREIN, LLP
Attorneys at Law
1030 SW Morrison Street
Portland, OR 97205
Telephone: (503) 222-1812  FAX: (503) 274-7979

As I've said before, this strategic shift to increasingly direct and personalized connections with consumers unlock strategic and financial opportunity for NIKE. This quarter, NIKE Direct gross margins contributed to our overall gross margin expansion of 130 basis points, being fueled by a higher mix of digital, which carries a higher gross margin rate as well as optimization of new pricing capabilities using advanced analytics in North America.

We are also continuing to test and learn within our full-frontal digital marketing activities and our pace of learning is accelerating with so much opportunity ahead. During Q3 in North America, we leveraged data to identify consumer cohorts and feature personalized product recommendations to members, to both activate members who have never purchased and increase repeat purchasing. We expect Datalogue to amplify our speed in analyzing consumer data and inform products marketing, and service recommendations; ultimately increasing member buying frequency, basket size and member retention rates. It is clear that our shift to a more direct member-centric business is beginning to drive strategic and financial value for NIKE, and we are confident we are making the right investments in the areas that matter most.

35.    Defendant Friend emphasized that NIKE's growth was led by NIKE Direct and, in particular, NIKE Digital: "NIKE, Inc. revenue grew 3% in Q3, declining 1% on a currency-neutral basis as NIKE Direct grew 16% led by strong NIKE Digital growth offset by declines in our wholesale business due to the timing of wholesale shipments caused by global supply chain challenges in North America and mandatory store closures in EMEA. Gross margin increased 130 basis points versus the prior year resulting from higher full-price product margins due in part to geography mix and favorable NIKE Digital mix partially offset by lower NIKE Direct rate as we continue to manage inventory levels due to COVID-19 as well as foreign exchange headwinds."

36.    Defendant Friend further stated: "We now expect [for the fourth quarter] gross margin to expand up to 75 basis points versus the prior year, reflecting the continued shifts we've seen to our more profitable NIKE Direct business, partially offset by higher logistics and freight costs and higher markdowns to liquidate excess inventory in EMEA."

37.    On June 24, 2021, NIKE released its financial results for the fourth quarter and full

fiscal year 2021 via a Form 8-K filed with the SEC. The Company reported NIKE Direct sales for the fourth quarter of 2021 increased 73 percent to $4.5 billion, and wholesale revenue also increased. NIKE Brand Digital grew 41 percent for the fourth quarter, while gross margin for the fourth quarter increased 850 basis points to 45.8 percent. "Nike's strong results this quarter and full fiscal year demonstrate Nike's unique competitive advantage and deep connection with consumers all over the world," stated Defendant Donahoe. "FY21 was a pivotal year for NIKE as we brought our Consumer Direct Acceleration strategy to life across the marketplace. Fueled by our momentum, we continue to invest in innovation and our digital leadership to set the foundation for NIKE's long-term growth," continued Defendant Donahoe. "Nike's brand momentum is a testament to our authentic consumer connections, digital strength and continued operational execution. As we advance our consumer-led digital transformation, we are building a new financial model that will continue to fuel long-term sustainable, profitable growth for Nike," stated Defendant Friend. NIKE Direct again was credited for being the driving factor in the increased revenues and increase in gross margin.

38.     The Company held a call with investors and analysts that day. Defendant Donahoe began his prepared remarks by highlighting the importance of the Company's digital business: "In Q4, we saw growth of over 95%, which translates to 19% growth for the fiscal year. This full-year growth was led by our owned digital business, which has now more than doubled versus FY19, prior to the pandemic." Defendant Donahoe later stated:

> As I said earlier, our owned Digital business has more than doubled over the last two years to over $9 billion. At the center of our digital ecosystem is our suite of apps, which in Q4 reflected over 40% of our owned digital business. This is the result of deeper consumer connections, fueled by compelling product and content.
>
> A key differentiator for us is membership – it has proven to be a compelling driver of repeat engagement and buying across digital and physical retail. In Q4, we

**PAGE 10 – VERIFIED DERIVATIVE COMPLAINT**

continued to see growth in member demand outpace total Digital growth, hitting a new record of $3 billion. This member demand growth was underscored by strong results across the consumer funnel, including member engagement, average order value and buying frequency.

And this fiscal year, we met the goals we set at our last Investor Day around membership a full year early, and now have more than 300 million Nike members. More importantly, buying member growth is outpacing new member growth, signaling progress on a deeper member-led commerce funnel.

*     *     *

Knowing and serving our members drives greater competitive separation. Today, we're the clear leaders in our industry, and we continue to see digital as our leading channel for growth in FY22. The combination of owned and partner digital revenue is now nearly 35 percent of our total business, more than three years ahead of our prior plan. We see no sign of this shift slowing. In fact, we believe we will achieve 50 percent digital mix of business across owned and partnered in FY25.

39.     Defendant Friend stated in his prepared remarks: "NIKE's Consumer Direct Acceleration is fueling a deeper consumer connection with our Brands and driving business results, all while highlighting greater strategic and financial opportunity ahead." Defendant Friend then stated that NIKE Direct was "now approaching 40 percent of total Nike Brand revenue" while NIKE Digital "represents 21 percent of total Nike Brand revenue…a milestone we've reached several years ahead of our prior plan."

40.     Again, NIKE Direct was credited for increasing gross margin.

41.     Defendant Friend further stated:

Growth will be led by Nike Direct and our strategic marketplace partners. Earlier, I mentioned Nike Direct is approaching 40 percent of our Brand business today, and we expect it to represent approximately 60 percent of the business in fiscal 25…led by growth in Digital. And as John said earlier, we expect owned and partnered digital to achieve 50 percent business mix in fiscal 25, with Nike owned Digital to represent 40 percent of the business.

We will continue reshaping our wholesale business portfolio, which includes divesting from undifferentiated retail while investing in our strategic wholesale partners for healthy growth. Overall, we expect wholesale revenue to remain

**PAGE 11 – VERIFIED DERIVATIVE COMPLAINT**

PATERNOSTER FARNELL & GREIN, LLP
Attorneys at Law
1030 SW Morrison Street
Portland, OR 97205
Telephone: (503) 222-1812  FAX: (503) 274-7979

roughly flat versus fiscal 21. We will support partners who continue to authenticate our Brand, as well as those who have the scale to create a consistent, premium, digitally-connected experience for consumers across the marketplace.

42.    The impact of the move to direct-to-consumer on gross margin was emphasized: "For several quarters now, I've highlighted that the strategic and financial benefit of shifting to a higher mix of business through Nike Direct, led by Digital, and leveraging enhanced data and analytics capabilities to optimize inventory, drive higher full price realization and lower Digital fulfillment costs. We now see Gross Margin rate reaching the high 40s by fiscal 25."

43.    When asked about the focus on digital sales and its profitability, Defendant Friend stated:

> I would just add that the NIKE app, our app ecosystem continues to have a significant impact and we are continuing to invest in the consumer experience in order to take advantage of the consumer's interest and appetite in engaging with our brand in that way. The app actually represents about 40% of our digital business at this point in time, and we're planning to launch the NIKE app in 10 more countries in fiscal year 2022.
>
> As I think about the financial model, Matt, as you asked, I sort of answered it in my question to Kimberly which is this shift to digital and that direct sales to the consumer is definitely causing us confidence to inflect our revenue outlook upwards as the first point.
>
> The second point I would say is that as we've continued to see over the past several quarters and really if you sort of look through the pandemic, it's really over the last three years as we've been seeing more and more business being done through direct and digital. We've been talking about how that shift in mix has enabled us to drive and increase our gross margin expansion versus historical levels of gross margin expansion, and so that's what's embedded in that high 40s guidance outlook. It's continuing to shift to more direct business and then within that direct business, we continue to see opportunities like I referenced, leveraging data and analytical capabilities. So digital transformation type capabilities to know where to place our inventory, how to fulfill demand closer to the consumer, whether it's through our stores or through our regional service centers, how to think about pricing based on the way inventory is flowing, and then continued demand and supply management.

44.    On September 23, 2021, NIKE released its financial results for the first quarter for

**PAGE 12 – VERIFIED DERIVATIVE COMPLAINT**

fiscal year 2022 via a Form 8-K filed with the SEC. The Company reported that NIKE Direct sales increased 28 percent to $4.7 billion, while gross margin increased 170 basis points to 46.5 percent. NIKE Brand Digital sales increased 29 percent. "Nike's strong results this quarter are continued proof of our deep consumer connections, unrelenting innovation pipeline and a digital advantage that fuels our brand momentum," stated Defendant Donahoe. "NIKE Brand Digital business continued strong growth, increasing by 25 percent, led by North America growth of 43 percent." "Our Q1 results illustrate how NIKE's Consumer Direct Acceleration strategy continues to fuel growth and transform our long-term financial model," stated Defendant Friend.

45.     The Company held a call with investors and analysts that day. As part of his prepared remarks, Defendant Donahoe stated:

Q1 was another strong quarter for NIKE with revenue growth at 16%. And even as we saw physical retail traffic return across much of the portfolio, digital continued its momentum with 25% currency-neutral growth led by North America at over 40.

Our digital success is evidence of the product innovation, brand strength, and scale that drives our meaningful relationships with consumers as we continue to show momentum against our biggest growth priorities.

*     *     *

Today, we're in a stronger position relative to our competition than we were prior to the pandemic. Why? Because the changes happening in the market worked in our favor. Consumers' shift to digital that might have taken five years will now only take two years. That plays to NIKE's advantage. And our Consumer Direct Acceleration strategy is capitalizing on this marketplace transformation.

46.     Defendant Donahoe then stated:

Next, let's discuss NIKE's increasing digital advantage. We continue to lead the industry by creating a premium, consistent, and seamless experience that deepens relationships between consumers and our brand. Our advantage comes to life at retail in both digital, as well as at the intersection of digital and physical. I'll discuss both here. Even as physical retail revenue approached pre-pandemic levels, our digital business this quarter grew double digits. This is the result of an unwavering focus on our strategy and the investments we've made against our end-to-end

**PAGE 13 – VERIFIED DERIVATIVE COMPLAINT**

digital transformation. And so, we continue to expect digital to be our leading channel for growth in fiscal 2022.

\*    \*    \*

Our digitally connected retail experiences are clearly resonating with consumers. This quarter, our in-line fleet grew over 70% in revenue, approaching pre-pandemic levels. We're seeing over-indexed growth from members, not just at digital but also at physical retail, with member buying penetration up double digits since last year. And so, we'll continue expanding these compelling experiences across our fleet in fiscal 2022, driving that interplay between physical and digital retail.

47.    In his prepared remarks, Defendant Friend stated:

NIKE's acceleration to a more direct member-centric business model continues to fuel deep connections between consumers and our portfolio of brands. Drawing upon our culture of innovation, unmatched global scale and our industry-leading digital platform, we continue to serve the modern consumer as only NIKE can. Our first quarter results proved again that our strategy is working, and NIKE's Consumer Direct Acceleration is fueling the transformation of our long-term financial model. Our relentless focus on serving the consumer translated into revenue growth of 16% and EBIT growth of 22% versus the prior year.

\*    \*    \*

NIKE Digital is now 21% of total NIKE brand revenue, which is an increase of 2 points versus last year, with strong double-digit growth versus the prior year even with broad reopening of physical retail. Digital is increasingly becoming a part of everyone's shopping journey, and we are well positioned to reach our vision of a 40% owned digital business by fiscal 2025.

48.    Again, the reported increase in gross margin was credited to NIKE Direct. And Defendant Friend stated: "we still expect gross margin to expand 125 basis points versus the prior year, at the low end of our prior guidance, reflecting stronger than expected full price realization, the ongoing shift to our more profitable NIKE Direct business, and price increases in the second half." Defendant Friend further stated:

Despite new short-term operational dynamics, our Consumer Direct Acceleration offense is driving our business forward and transforming our financial model toward the long-term fiscal 2025 financial outlook I shared last quarter. This quarter's impressive results are additional proof that our strategy is right, not only for the moment we find ourselves in, but also for the opportunity to serve the future

**PAGE 14 – VERIFIED DERIVATIVE COMPLAINT**

of athletes and sport, like only NIKE can.

49.    In response to a question about the variables impacting the forecasted gross

margins, Defendant Friend stated:

> We believe that this quarter was an excellent proof point of the success that we're seeing in driving our consumer-led digital transformation. We're seeing meaningful movement forward in both NIKE Direct mix of business and also NIKE Digital mix of business, as I mentioned. And it's what fueled our gross margin expansion in the first quarter. High levels of full price realization, greater mix of NIKE Direct and NIKE Digital business, and lower markdowns as we leverage the capabilities that we have to serve consumer demand how and where they want it. As we look longer term, we're absolutely continuing to look towards that high-40s gross margin outlook that we provided last quarter, and in the short term we're going to navigate through these transitory impacts.

50.    Defendant Friend emphasized the direct-to-consumer's expected impact on the

Company:

> [W]e're more convinced and committed to what we believe the capabilities we need to operate a consumer-direct business at scale as we execute this strategy. And so that's where our focus and attention is going to be. We're going to keep our teams focused on creating those capabilities, which we're seeing translate into strong growth and profitability. And that also includes the investments that we're making from a brand perspective. Strong brands get stronger in this environment, and having that deep consumer connection, especially when it's rooted to sport and the return of sport, is absolutely what we need to be doing in order to continue to stay in a position of strength.

51.    On December 20, 2021, NIKE released its financial results for the second quarter

of fiscal year 2022 via a Form 8-K filed with the SEC. The Company reported NIKE Direct sales

had increased 9 percent, gross margin increased to 45.9 percent, and NIKE Brand Digital sales

increased 12 percent. "NIKE's strong results this quarter provide further proof that our strategy is

working," stated Defendant Donahoe. "Our second quarter results reflect our deep consumer

connections, the continued strength of our brands and strong marketplace demand. As we navigate

through short-term supply challenges, we are focused on executing our Consumer Direct

**PAGE 15 – VERIFIED DERIVATIVE COMPLAINT**

Acceleration strategy to fuel our long-term financial outlook," stated Defendant Friend.

52.     The Company held a call with investors and analysts that day. In his prepared remarks, Defendant Donahoe stated: "More broadly, this holiday season has shown the power of our digital transformation across the globe. Digital is the engine driving our Consumer Direct Acceleration strategy."

53.     Defendant Friend stated:

Turning to our digital business... Nike's digital growth is outperforming comparisons and being fueled by our member-centric focus. Nike Digital grew 11% in the quarter, on a currency neutral basis, setting the pace for the industry. Nike Digital is now 25% of total NIKE Brand revenue, up three points versus the prior year and more than double the digital mix in Fiscal '19. Enhanced onboarding experiences are attracting millions of new members into the top of the funnel, and we are focused heavily on member engagement and buying. Member engagement grew 27 percent, and repeat buyers grew 50 percent versus last year, driving overall higher AUR, AOV and member buying frequency. 40% of total digital demand this year is coming from our mobile apps, highlighting the strength of our digital platform.

54.     On March 21, 2022, NIKE released its financial results for the third quarter of fiscal year 2022 via a Form 8-K filed with the SEC. The Company reported a 15% increase in NIKE Direct sales, an increase in NIKE Brand Digital sales of 19%, and that gross margin increased 100 basis points to 46.6 percent. "NIKE's strong results this quarter show that our Consumer Direct Acceleration strategy is working, as we invest to achieve our growth opportunities. Fueled by deep consumer connections, compelling product innovation and an expanding digital advantage, we have the right playbook to navigate volatility and create value through our relentless drive to serve the future of sport," stated Defendant Donahoe. "Our third quarter results demonstrate NIKE's ability to navigate through volatility, while continuing to serve consumers directly and digitally, at scale," stated Defendant Friend.

55.     The Company held a call with investors and analysts that day. Defendant Donahoe

**PAGE 16 – VERIFIED DERIVATIVE COMPLAINT**

stated: "As we create the future of retail, we build on our own Digital capabilities that connect and

serve consumers at scale. In Q3, Digital revenue was up 22% on a currency-neutral basis, as we

continue to drive greater competitive separation, particularly through our app ecosystem. The Nike

App was up more than 50% in the quarter and overtook Nike.com on mobile for our highest share

of Digital demand."

56.    Defendant Friend stated in his prepared remarks:

> Over the past four years, we have reduced the number of wholesale accounts
> worldwide by more than 50 percent, while delivering strong revenue growth
> through Nike Direct and our remaining wholesale partners. We are now moving
> into the next phase of our marketplace strategy. We have finished communicating
> the big account pivots and our go forward growth plans are aligned with our
> wholesale partners. Wholesale partners play an integral role in our future
> marketplace, first to authenticate our brands, and then to create scale of distribution
> through a consistent consumer experience across a larger retail footprint. We will
> drive healthy wholesale growth with our remaining wholesale partners and
> recapture dislocated demand by elevating our partners' retail environment and
> digitally-connecting Nike membership with their retail experience.

57.    Defendant Friend closed by stating: "our strategy is working. NIKE's brand

strength and consumer demand remains at an all-time high, and we are confident in our business

momentum. Our deep focus on the consumer and sport is what sets us apart from the rest."

58.    When asked about the new strategy for wholesale partners, Defendant Friend

stated:

> [F]for the past several years, we have been editing our account portfolio. And at
> this pivot in time, we have made the edits and communicated those edits to our
> partners. And we're focused now on driving growth through our remaining
> wholesale partners. And to create the marketplace of the future, both through
> digital, our owned stores and our partners, it's going to require us to also invest with
> our partners in their consumer experiences so that the consumer has a premium
> consistent experience as they move across the marketplace and can find the NIKE
> product when and where they want it.

59.    Defendant Friend emphasized that NIKE was continuing with its direct-to-

PAGE 17 – VERIFIED DERIVATIVE COMPLAINT

PATERNOSTER FARNELL & GREIN, LLP
Attorneys at Law
1030 SW Morrison Street
Portland, OR 97205
Telephone: (503) 222-1812  FAX: (503) 274-7979

consumer strategy: "We're looking at fiscal '23 and believe the foundation is set for another year

of strong growth. And that's because our Consumer Direct Acceleration strategy is working."

Defendant Donahoe emphasized NIKE Digital's importance as part of that strategy:

> We see this marketplace strategy positioning us even more strongly for healthy,
> sustainable growth in North America. And it starts with Digital. You saw the Digital
> growth rate in North America, I think it was 33% this past quarter. It's been very
> strong. And NIKE is one of the very few brands that's on the home screen of the
> mobile app. And we don't just have 1 mobile app. We have the NIKE Mobile app,
> the SNKRS mobile app, the NTC and NRC. And that is very scarce space to have
> clear digital competitive advantage.

60.     Defendant Friend also emphasized NIKE Digital's role in the Company's future

growth:

> As it relates to Digital, as both [Defendant Donahoe] and I mentioned on the call,
> the growth we continue to deliver through that channel continues to be fantastic and
> it's the consumer that's leading that transition.

> To be able to deliver double-digit traffic -- growth in traffic in North America this
> past quarter really stood out as an outlier relative to where other brands and retailers
> were seeing traffic growth. And to us, it's a signal of the strength of our brand and
> the fact that the consumer continues to choose this channel to engage, the fact that
> the app downloads have increased on a quarter-over-quarter basis, the fact that
> we're seeing the app drive a greater proportion of our overall business connects
> membership. And the way that we're going to try to connect membership into the
> marketplace, we continue to feel very strong that Consumer Direct Acceleration led
> by Digital is what's going to drive us towards that fiscal year '25 goal.

> And as we've mentioned before, we earn a higher gross margin on our sales through
> the digital channels, and we expect to see leverage in our costs, which will enable
> us to hit that high teens operating profit over the multiyear period.

61.     NIKE touted the benefits of the Company's focus on shifting away from wholesale

and towards direct-to-consumer. However, in April 2022, Simeon Siegel, managing director for

equity research at BMO Capital Markets, said that moving from wholesale to direct-to-consumer

"appears to hurt, not help, overall company profitability." While Siegel believed NIKE would

remain competitive, he stated that he was "wary of perceived margin benefits behind the [direct-

PATERNOSTER FARNELL & GREIN, LLP
Attorneys at Law
1030 SW Morrison Street
Portland, OR 97205
Telephone: (503) 222-1812  FAX: (503) 274-7979

to-consumer] shift. . . .Higher [direct-to-consumer] didn't appear to necessarily drive improved regional GM/EBIT margin."

62.     On June 27, 2022, NIKE released its financial results for the fourth quarter and full year for fiscal year 2022 via a Form 8-K filed with the SEC. While the Company reported that fourth quarter revenues were down 1 percent, NIKE Direct revenues were up 7 percent, to $4.8 billion. "NIKE's results this fiscal year are a testament to the unmatched strength of our brands our deep connection with consumers," stated Defendant Donahoe. "Two years into executing our Consumer Direct Acceleration, we are better positioned than ever to drive long-term growth while serving consumers directly at scale," stated Defendant Friend. The Company credited NIKE Direct's growth for the increase in revenues and the increase in gross margins.

63.     The Company held a call with investors and analysts that day. Defendant Donahoe stated: "as we look ahead to fiscal 23, we remain very confident in our long-term strategy and our growth outlook. … the fundamental shift in consumer behavior toward Digital, continue[s] to create energy for us."

64.     Defendant Donahoe emphasized NIKE's competitive advantage in the digital space, "as one of the few brands that can connect with and directly serve consumers at scale," and the strength of its direct-to-consumer approach:

> With an owned digital business that grew 18% in fiscal 22, we continue to set the pace in our industry by creating a premium, consistent and seamless experience that drives one-to-one consumer experiences at scale.
>
> This quarter, our app ecosystem grew into an even greater share of our total Digital demand, helping our Digital share of the business reach 24% in Q4. This is a shift being led by the consumer, as they pursue the most personalized shopping experience Nike provides. We do not take lightly the choice made by consumers to put us in the most prized real estate that exists today: the home screen of their phone. No other brand occupies that space globally like Nike – it remains one of our biggest competitive advantages.

**PAGE 19 – VERIFIED DERIVATIVE COMPLAINT**

Moving to physical retail, we continue to bring to life our vision of giving consumers personalized digital experiences regardless of channel. We know consumers expect us to know who they are online or offline and across the full array of monobrand stores, Nike Digital, and our wholesale partners.

Within our Nike-owned stores, higher levels of connectivity across physical and digital are simply driving a better consumer experience. Online-to-offline services, such as "buy online pick up in store" and "ship from store," are driving growth, with 100% of our North America stores now offering at least one element of O2O.

65.     Defendant Friend spoke directly to the progress of the Company's Consumer Direct

Acceleration strategy:

Two years ago, we introduced a bold new phase of our strategy: our Consumer Direct Acceleration. In the early months of the pandemic, we set our sights beyond simply navigating through short-term volatility. Instead, we outlined a clear vision to pursue even further competitive separation – by expanding our digital advantage, re-shaping the marketplace of the future, and creating deeper, more direct consumer relationships.

Today, NIKE's continued momentum shows that our strategy is working.

*     *     *

Next, our consumer-led digital transformation is driving long-term growth and value. A more digitally connected NIKE is a more valuable NIKE. Today, our owned digital business – representing over $10 billion in revenue – is more than double in size versus pre-pandemic levels. After increasing market share and gaining 3 percentage points from the prior year, NIKE Digital now represents 24% of total Brand revenue.

More importantly, we are accelerating the pace and scale of NIKE's direct consumer connections. With growing digital traffic and NIKE App downloads, our apps now represent almost 50% of total digital demand. In turn, increased digital engagement is translating into more repeat buyers, a higher buying frequency, and increased average order value – ultimately driving higher lifetime value through membership.

As retail consolidation continues, and consumers converge around fewer digital platforms, a distinct NIKE consumer experience is driving more direct connections –positioning us well for long-term growth.

66.     Defendant Friend concluded: "Our Consumer Direct Acceleration is working. Our

long-term vision has never been more clear. And if there is anything that 50 years of growth have

**PAGE 20 – VERIFIED DERIVATIVE COMPLAINT**

proven, it's that with the right team, and the right strategy, the future is ours to create."

67.    When asked about the Company's confidence in the previously forecasted increases

in gross margins by moving to direct-to-consumer, Defendant Friend stated:

> Our gross margins were down 80 basis points in the fourth quarter, and that is really reflective of two elements. From an operational perspective, if you look at the growth that we saw in Nike Direct and the expanding margins that we saw both in Nike Direct and Nike Digital and a higher full price selling mix overall, our gross margins would have expanded over 100 basis points in the fourth quarter. … when we look at the underlying health of our business and the margin expansion that we see attributed to the shifting business mix from wholesale to more direct and more digital, we are seeing it, and the financial benefits that come from it in our gross margins.

> Since fiscal year 2020 our gross margins are up over 260 basis points and that includes in fiscal year 2022 100 basis point headwind from elevated ocean freight costs. …

> As we look ahead to fiscal 2023 and our guidance were flat to decline 50 bps we're planning for mid-single-digit price increases. We're planning for additional expansion from our growing Nike Direct business and our digital business, which we believe will continue to lead our channel growth, but that's being offset by another 100 basis points of ocean freight, so if you take 2022 and 2023 together it's about a 200 basis point impact on a two-year basis from paying those higher-rates to move product from Asia to our other geographies, and that has a significant impact on where we are today relative to where we would be. We still believe in the high-40s gross margin goal. We believe those costs are transitory in nature, but we expect it's going to take a few years to revert so we're planning for that accordingly.

*    *    *

> As far as the longer-term goes as I mentioned, we continue to believe in that high-40s number and it's going to be fueled by this ongoing consumer-led shift to direct-to-digital.

Then, when asked about whether wholesale or direct-to-consumer would grow faster, Defendant Friend stated:

> And so if you look specifically to 2023, Nike Direct will lead our growth and Nike Digital will be our fastest-growing channel but we do expect to see wholesale growth look different, in other words turn and grow, based on available inventory supply flowing back into our geographies, and so we do expect to see wholesale growth in fiscal 2023. 29 I think as John said long-term, this is a consumer-led

**PAGE 21 – VERIFIED DERIVATIVE COMPLAINT**

digital transformation, but I still think that our longer-term vision of Nike Direct representing approximately 60% of our business in digital, owned digital representing 40, is a trajectory that we are still on. We're seeing growth in our digital business that's exceeding what's happening in the marketplace. We're watching our own digital traffic and accelerating level of Nike app downloads that's driving more consumer engagement against our digital platform and that is driving growth and shift relative to the broader marketplace, and while we're up about 9 points of business mix, versus FY 2020, we continue to believe that digital is going to be as John has said again and again and again, a fuel for growth for us over the next three to five years.

68.     On September 29, 2022, NIKE released its financial results for the first quarter of fiscal year 2023 via a Form 8-K filed with the SEC. Revenues up 4 percent. The Company reported NIKE Direct sales increased 8 percent to $5.1 billion, and NIKE Brand Digital sales increased 16 percent. Gross margin, however, decreased 220 basis points. "Our competitive advantages, including the strength of our brand, deep consumer connections and pipeline of innovative product, continue to prove that our strategy is working. We expect our unrelenting focus on better serving the consumer to continue to fuel growth and create value like only NIKE can," stated Defendant Donahoe. "Our focus continues to be the consumer, as we take action to navigate near-term dynamics while expanding long-term structural benefits through our Consumer Direct Acceleration strategy," stated Defendant Friend. The Company stated that the gross margin decrease was "primarily driven by elevated freight and logistics costs," though "lower margins in our NIKE Direct business driven by higher markdowns" was cited.

69.     The Company held a call with investors and analysts that day. Defendant Donahoe stated:

> [NIKE'S financial] results reflect our deep connection to consumers around the world as we keep them in the center of all that we do. Our Consumer Direct Acceleration strategy enables us to create value around consumer creation, consumer demand, and an entire marketplace fueled by the lifelong relationships we maintain. This significant momentum that we're seeing is fueled by structural tailwinds that continue to create energy for us.

**PAGE 22 – VERIFIED DERIVATIVE COMPLAINT**

NIKE's growth is strengthened quarter by quarter by the expanded definition of sport, by the societal movement toward comfort and health and wellness, and by the fundamental shift in consumer behavior toward digital.

70.    Defendant Donahoe emphasized the Company's Consumer Direct Acceleration strategy:

We're continuing to accelerate against our One NIKE Marketplace approach, in which we directly connect with the consumer, no matter where they shop, and with each channel playing an integrated role in the consumer's overall journey. Now, our approach starts with NIKE Digital, as that's where most consumers begin their shopping journeys. Then it's augmented by our strategic wholesale partners who share our vision to provide a consistent premium and seamless consumer experience. Last but not least are our monobrand stores, which continue to play the key role of supplementing where there are gaps in the marketplace, such as women's or Jordan.

Now this quarter, we delivered NIKE Digital's highest net revenue quarter ever. We see consumers continuing to vote for NIKE Digital as the NIKE commerce app had its highest traffic in history during Q1. We keep elevating our ability to serve these consumers. For example, new membership tools we put in place last year in Fiscal '22 that went live in Q1 create one-to-one connections at scale by delivering personalized consumer journeys and experiences, which in turn drive first purchases and increased loyalty.

*    *    *

Finally in our marketplace strategy, we continue to build a compelling retail footprint with our own brick-and-mortar fleet. As Direct becomes an even bigger part of our business, we're investing in becoming a better retailer as we pursue our goal of becoming world-class in this space. In a dynamic retail environment, our global traffic is up, thanks in part to the unique NIKE experiences we offer across our assortment of retail concepts.

71.    Defendant Friend also touted the strength of the Consumer Direct Acceleration strategy:

NIKE's competitive advantages are also growing as the Consumer Direct Acceleration transforms our operating model, driving deeper and more direct connections through digital.

*    *    *

Since Fiscal '19, our digital business has nearly tripled to exceed $10 billion in

**PAGE 23 – VERIFIED DERIVATIVE COMPLAINT**

revenue, representing 24% of total NIKE brand revenue in Fiscal '22. Over this period, NIKE direct gross margins expanded, through the combination of rapid digital growth and improvements in channel margin profitability, ultimately fueling NIKE's overall gross margin expansion, despite being partially offset by transitory headwinds experienced through the pandemic.

While we continue to manage through short-term dynamics, these structural tailwinds give us confidence that we are making progress towards our long-term financial goals.

72.     Again, Defendant Donahoe defended the decision to shift towards direct-to-consumer sales:

This directly connecting with consumers is critical to serve consumers going forward, to have that direct connection, use our membership program to translate what has been a transactional relationship into a lifetime relationship of value, whether it's directly or through our partners. With our movement toward Direct, both Digital and our own monobrand stores, as [Defendant Friend] has said each quarter, there is a structural benefit to our margins. It's good for consumer, it's good for competitive position, and it's also good for our margins. That's why we're staying ruthlessly focused on it. That's why you see our Digital growth rate still continuing to be quite strong. We will continue to move ahead on our marketplace strategy.

73.     On December 20, 2022, NIKE released its financial results for the second quarter of fiscal year 2023 via a Form 8-K filed with the SEC. The Company reported an increase in revenues of 17 percent, with NIKE Direct sales up 16 percent and NIKE Brand Digital sales up 25 percent. Gross margin decreased 300 basis points "primarily due to higher markdowns to liquidate inventory." The Company reported that inventories had increased 43 percent, "driven by an increase in units from lapping prior year supply chain disruption." "Nike's results this quarter are a testament to our deep connection with consumers," stated Defendant Donahoe. "Consumer demand for Nike's portfolio of brands continues to drive strong business momentum in a dynamic environment. We remain focused on what we control, and we are on track to deliver on our operational and financial goals — setting the foundation for sustainable, profitable growth," stated

**PAGE 24 – VERIFIED DERIVATIVE COMPLAINT**

Defendant Friend.

74.     The Company held a call with investors and analysts that day. Defendant Donahoe stated:

> As I mentioned earlier, our Q2 results speak to the continued success of our strategy. Consumer Direct Acceleration is fueling our marketplace approach in which we directly connect with the consumer no matter where they shop. Today, our marketplace strategy is driving distinction in this current promotional environment. Our work to directly connect with consumers is founded on a simple consumer insight.
>
> Consumers want to get what they want, when they want it and how they want it. And consumers have told us they want a consistent, seamless and premium experience both digitally and physically around monobrand and multiband. And so we're serving consumers digitally with our suite of apps. We're extending our reach and convenience through our strategic wholesale partnerships and leveraging monobrand doors to fill the gap for underserved opportunities like Women's fitness and Jordan.

75.     Defendant Donahoe emphasized NIKE Digital's growth:

> And if there is one dimension that I would say is kind of a fourth source of competitive advantage from our historical ones, it's this digital advantage. And it's -- you see we grew Digital 34% in an e-commerce -- global e-commerce market that most people would say is low single digits. And that is where having the direct connection with consumers, having the best apps in the industry allows us to leverage the full funnel of our membership base. And we believe that's going to be an important and fourth source of competitive advantage throughout the globe, and that will continue for quarters and years to come. So we're staying focused on the fundamentals, to be honest. And with the strong mantras, let's make sure we get stronger and create greater competitive separation regardless of what the environment throws us.

76.     On March 21, 2023, NIKE released its financial results for the third quarter of fiscal year 2023 via a Form 8-K filed with the SEC. Revenues increased 14 percent. The Company reported that NIKE Direct sales increased 17 percent and NIKE Brand Digital sales increased 20 percent. Gross margin decreased 330 basis points. "NIKE's strong results in the third quarter offer continued proof of the success of our Consumer Direct Acceleration strategy. Fueled by

PATERNOSTER FARNELL & GREIN, LLP
Attorneys at Law
1030 SW Morrison Street
Portland, OR 97205
Telephone: (503) 222-1812  FAX: (503) 274-7979

compelling product innovation, deep relationships with consumers and a digital advantage that fuels brand momentum, our proven playbook allows us to navigate volatility as we create value and drive long-term growth," stated Defendant Donahoe. The decrease in gross margin was "primarily due to higher markdowns to liquidate inventory."

77.    The Company held a call with investors and analysts that day. Defendant Donahoe opened the call by linking the Company's growth with digital growth:

> Our growth this quarter was broad-based across our brands, channels and geographies. We had strong digital growth of 24%, which once again was fueled by double-digit increases in traffic on mobile and our apps. While Direct, led by digital, remains strong and will continue to drive our growth, our wholesale channel continues to be an important part of our strategy as we access key consumer segments and achieve distribution scale across the marketplace. Wholesale grew 18% in Q3, reflecting strong retail sales, with growth that over-indexed across our strategic partners.

78.    Defendant Friend underscored the Company's growth in the direct-to-consumer space: "NIKE Direct outperformed, with member buying frequency increasing and store sales growing across all geographies. Another quarter of industry-leading digital growth – up 24% in Q3 – drove our digital share of business up to 27%."

79.    Defendant Friend also reiterated the Company's plan to shift to direct-to-consumer:

> And so what we said was that we were going to prioritize the investments that we've been making for several years in our consumer-led digital transformation, the capabilities and the ways of working that are enabling us to create a new operating model for NIKE. And we would manage expense growth tightly, and we would reduce our planned head count growth. And we've absolutely done that over the last 2 quarters and feel very good about the momentum that we've been making with regards to ensuring that our resources are flowing towards the priorities that we have.

80.    When asked about the Company's margins, Defendant Friend stated:

> Well, we've been talking for some time about the -- how our consumer-led digital transformation is transforming NIKE's financial model. And you really see it both in terms of revenue and in gross margin. And if you look at the momentum that

PATERNOSTER FARNELL & GREIN, LLP
Attorneys at Law
1030 SW Morrison Street
Portland, OR 97205
Telephone: (503) 222-1812  FAX: (503) 274-7979

we've been driving from a top line perspective, I would say that we've benefited from roughly 3 points of benefit related to a higher mix of business going through our digital and our direct channels. And you can see that not only in the algorithm that we provided around high single digit to low double-digit growth but just looking at our ASP performance and the continued momentum that we're seeing as digital goes from being about 9% of our business in fiscal year '19 to exiting this quarter at 27% of our mix of business.

We've always said that the margin contribution from our digital business is higher than the wholesale channels. And that had fueled gross margin expansion from fiscal year '19 to fiscal year '22. And as we look at some of the dynamics that I referenced on the call this quarter, what I was really trying to highlight is that not only is the channel mix a tailwind for us as we grow our digital business, but we actually think there's opportunities for us to improve the profitability of the digital channel. And those 2 examples that I gave this quarter really were intended to reflect that.

*    *    *

I think as we look longer term, we remain confident in our ability to continue to drive towards the long-term goals that we've provided. Obviously, this year, we've seen higher markdowns and promotions in our direct channels as we've been moving through excess inventory, but we think those are transitory costs, and we should begin to see the recovery of those beginning in fiscal year '24.

81.    In June 2023, NIKE announced that it planned to reestablish its relationships with Designer Shoe Warehouse and Macy's, which had ended in 2021. One industry journalist saw the move as a "masterclass in omnichannel retailing," and concluded: "2024 could be a financial cake walk for Nike. After resetting their comp sales base in 2023, Nike has built in automatic comp sales growth for 2024 from the renewed wholesale relationships."

82.    On June 29, 2023, NIKE released its financial results for the fourth quarter and full year for fiscal year 2023 via a Form 8-K filed with the SEC. The Company reported full year revenues were up 10 percent, while fourth quarter revenues had increased 5 percent. NIKE Direct revenues for the fourth quarter had increased 15 percent compared to prior year, led by NIKE Brand Digital growth of 14 percent. Gross margin for fourth quarter decreased 140 basis points.

PATERNOSTER FARNELL & GREIN, LLP
Attorneys at Law
1030 SW Morrison Street
Portland, OR 97205
Telephone: (503) 222-1812  FAX: (503) 274-7979

"NIKE's strong results make clear that our strategy is working. FY23 was a milestone year for NIKE as our unique advantages continue to drive competitive separation," stated Defendant Donahoe. "FY23 demonstrated the power of NIKE's portfolio to fuel strong growth, year after year," stated Defendant Friend. The decrease in gross margin was attributed to "higher product input costs and elevated freight and logistics costs, higher markdowns."

83.     The Company held a call with investors and analysts that day. Defendant Donahoe stated:

> Today, in the industry, with digital and physical growth converging, we've accelerated investment to create a truly distinctive digital experience through our own platforms. Every year, we serve traffic in the billions, which delivers strong Digital growth, as both conversion rate and average order value continue to improve. This success helped increase the digital share of our business to 26% in FY23, as compared to 10% in FY19. For the year, we had strong digital growth of 24% and we expect digital to continue to lead our growth.

84.     Defendant Friend echoed these remarks:

> [W]e are accelerating direct consumer relationships across our digital platforms. By better knowing and serving the consumers who love our brands, we are also unlocking strategic and financial benefits for Nike. For example, we have partnered with Adobe to enable 1:1 member personalization, driving gains in member retention, click-thru rates, and conversion resulting in higher demand per member and returns on digital ad spend. We are only beginning to operationalize these new capabilities and consumer experiences on our digital platforms, and we see even greater opportunity to come.

85.     When asked about the Company's decision to re-open wholesale partnerships with Designer Shoe Wearhouse and Macy's, Defendant Donahoe stated:

> Consumers want digital and physical access. They shop across both channels. They want a monobrand and multibrand. They use different shopping occasions. They use different channels. Consumers expect us to know who they are, and consumers have said to us they want a consistent and seamless experience. And so that is what has driven our marketplace strategy.
>
> And as you know, it starts with digital, our -- a direct connection with the consumer. Our digital apps, our mobile apps are unmatched in the industry, and that's our

**PAGE 28 – VERIFIED DERIVATIVE COMPLAINT**

fastest-growing channel. That will continue to be our fastest-growing channel because we directly connect with the consumer digitally.

*      *      *

Our Direct business will continue to grow the fastest, but we'll continue to expand our marketplace strategy to enable access to as many consumers as possible and drive growth.

86.     Defendant Friend underscored the point: "NIKE Direct is going to continue to lead our growth." He then stated:

> We're making substantial progress towards the long-term goals that we had highlighted a couple of years ago. Our Consumer Direct Acceleration strategy has been a consumer-led strategy, and when we look at the mix of our business in digital and in direct relative to where we were in fiscal year '19, we've made significant progress against it. And we continue to invest to grow based on the fact that consumer continues to choose to shop in our stores and in our digital channels or at least to engage in our digital channels before they go try to find the product that they want in our -- in the wholesale marketplace.
>
> And so we're very pleased with where we are today. We finished fiscal year '23 at a 44% mix in total direct and a 26% mix in digital. And the consumer will decide the ultimate end point. And what I mean by that is whether we land exactly at 60% or not doesn't really matter. But what we are confident long term is that we're going to be a more direct and a more profitable company.

87.     On September 28, 2023, NIKE released its financial results for the first quarter of fiscal year 2024 via a Form 8-K filed with the SEC. The Company reported that revenues had increased 2 percent, as had NIKE Brand Digital sales. Gross margin again decreased, "primarily driven by higher product costs."

88.     The Company held a call with investors and analysts that day. Defendant Friend stated that the direct-to-consumer shift was still successful:

> Nike Direct continues to lead our growth, up 6% versus the prior year. As we deliver on our strategy to elevate the marketplace through premium physical and digital retail experiences, we continue to see that consumers want to connect directly and personally with our brands. And in fact, member engagement within our Direct business is up double-digits versus the prior year, with increasing average order

**PAGE 29 – VERIFIED DERIVATIVE COMPLAINT**

PATERNOSTER FARNELL & GREIN, LLP
Attorneys at Law
1030 SW Morrison Street
Portland, OR 97205
Telephone: (503) 222-1812  FAX: (503) 274-7979

values.

Our Stores delivered an especially strong quarter, with traffic up double-digits from last year and members driving an increasing share of business, as consumers shifted from our digital to physical channels. This is similar to what we are seeing across the industry, and after seeing this trend building in early June, our team was nimble in transitioning inventory to capture higher full-price sales across our entire store fleet.

Nike Digital grew 2% with non-linear comparisons to the prior year including liquidation actions and a higher number of product launches on the SNKRS App in Fiscal '23.

Looking through all that, what stands out are the underlying consumer trends we see in our Digital business. This includes sustained momentum on the Nike Mobile App, with growth in traffic and increasing member buying frequency. We continue to see a growing structural advantage as more consumers start their shopping journeys with us on mobile.

89.     Defendant Friend reiterated the Company's stance on its direct-to-consumer

strategy:

And then, of course, we do expect that while the ultimate landing spot of digital and direct isn't as clear, we do believe we're going to be a more direct and a more digital company and a more profitable company. And there's a channel mix and channel profitability opportunity that comes with that as well. So, we continue to believe these goals are achievable. And based on our gross margin plans for this year, our performance in the first quarter, we believe we're turning the corner on starting to climb to greater profitability as a company and as a brand.

90.     When asked about the Company's move away from physical stores, Defendant

Friend stated:

When I think about the momentum that we've seen over the last several years from a digital perspective, you're right. We have shifted our channel mix, and that's been a consumer-led and a consumer-driven shift based on the consumers' desire to want to connect with NIKE, both through our digital apps and through our stores.

What we saw this quarter wasn't unexpected for us. And when we look underneath the momentum that we saw in our NIKE mobile app, we saw a strong growth, high single-digit growth in traffic. We saw member activity continue to increase both in terms of engagement and buying behavior and a higher basket size, a higher AOV. And so we continue to be focused on creating the best personalized experience for our members from a digital perspective. And we believe that that's going to

**PAGE 30 – VERIFIED DERIVATIVE COMPLAINT**

PATERNOSTER FARNELL & GREIN, LLP
Attorneys at Law
1030 SW Morrison Street
Portland, OR 97205
Telephone: (503) 222-1812  FAX: (503) 274-7979

continue to fuel growth in our digital business over the long term.

91.    The foregoing statements were materially false and misleading, and failed to disclose materially adverse facts about the Company's business and operations. Specifically, the statements failed to disclose that (a) the transition to direct-to-consumer sales was not able to support long-term, sustainable growth, (b) NIKE's reduction in wholesale partners harmed the Company's ability to sustain long-term growth, and (c) NIKE Direct and NIKE Digital would not maintain the large gross margin as claimed.

### C.    The Truth is Revealed.

92.    On December 21, 2023, NIKE released its financial results for the second quarter of fiscal year 2024 via a Form 8-K filed with the SEC. The Company reported revenues of $13.4 billion, an increase of 1 percent. NIKE Direct revenues increased 6 percent, and Nike Brand Digital sales increased 4 percent. The Company announced that it was "identifying opportunities to deliver up to $2 billion in cumulative cost savings over the next three years. Areas of potential savings include simplifying our product assortment, increasing automation and use of technology, streamlining our organization, and leveraging our scale to drive greater efficiency."

93.    The Company held a call with investors and analysts that day. Defendant Friend stated:

> In Q2, NIKE Direct once again led our growth and wholesale shipments exceeded our expectations. Having said that, we are seeing indications of more cautious consumer behavior around the world in an uneven macro environment.
>
> Total retail sales across the marketplace fell short of our expectations with softer demand outside of the key consumer moments. While NIKE's store traffic continued to grow, we saw softness in digital traffic and higher levels of promotional activity across the marketplace. As a result, we are adjusting our channel growth plans for the remainder of the year.

94.    Defendant Friend admitted that the Company's transition to direct-to-consumer

**PAGE 31 – VERIFIED DERIVATIVE COMPLAINT**

sales had created some issues:

> Since fiscal '19, our investments in accelerating NIKE's Consumer Direct vision have created new operating capabilities, added tens of millions of new members to our member base and delivered a return of more than $12 billion of incremental revenue. However, we have also added complexity and inefficiency. In this competitive environment, we need to accelerate our pace of innovation, elevate our marketplace experiences, maximize the impact of our storytelling and increase our speed and responsiveness, all in service of the consumer.

95.     NIKE's Class B common stock fell almost 12% on this news, from closing at $122.53 per share on December 21, 2023, to close at $108.04 per share on December 22, 2023.

96.     On March 21, 2024, NIKE released its financial results for the third quarter of fiscal year 2024 via a Form 8-K filed with the SEC. The Company reported that third quarter revenues were "slightly up," at $12.4 billion. NIKE Direct revenues were $5.4 billion, also "slightly up," while there was a 3% year-over-year decline in NIKE Brand Digital sales. Defendant Donahoe stated: "We're encouraged by the progress we've seen, as we build a multiyear cycle of new innovation, sharpen our brand storytelling and work with our wholesale partners to elevate and grow the marketplace."

97.     The Company held a call with investors and analysts that day. Defendant Donahoe stated:

> [W]e know NIKE is not performing at our potential. While our Consumer Direct Acceleration strategy has driven growth and direct connections with consumers, it's been clear that we need to make some important adjustments.
>
> *       *       *
>
> And, while NIKE Direct will continue to play a critical role, we must lean in with our wholesale partners to elevate our brand and grow the total marketplace.

98.     Defendant Donahoe underscored the Company's shift back to wholesale: "And we are increasing our investment in wholesale to help us elevate and grow the entire marketplace. We

**PAGE 32 – VERIFIED DERIVATIVE COMPLAINT**

recognize that our wholesale partners help us scale our innovation and newness in physical stores and connect our brands in the path of the consumer."

99.     NIKE Class B common stock fell on this news, closing at $93.86 per share on March 22, 2024, compared to $100.82 per share on March 21, 2024.

100.     On June 27, 2024, NIKE released its financial results for the fourth quarter and full year for fiscal year 2024 via a Form 8-K filed with the SEC. The Company reported that full year revenues increased by $0.2 billion, while fourth quarter revenues decreased 2 percent to $12.6 billion. NIKE Direct revenues for fourth quarter dropped 8 percent to $5.1 billion due to declines in NIKE Brand Digital.

101.     The Company held a call with investors and analysts that day. Defendant Friend stated:

> Nike Digital declined 10% in the quarter. Although our digital business has grown at an approximately 26% CAGR since Fiscal 19, we missed our Q4 plan on softer traffic, higher promotions, and lower sales of certain classic footwear franchise. More specifically, these franchises underperformed our overall digital business results in the quarter, especially in April and May, and continuing into early June. This is even as they continue to drive retail sales growth at high full-price realization in multi-brand retail.

102.     When asked about the impacts of the Consumer Direct Acceleration program on margins, Defendant Friend stated:

> I would say in general, we've driven incredible growth in our Digital business over the last four years and we've had a lot of confidence in our ability to continue to drive those results against the consumer opportunity that's in the marketplace. I think most recently in the context of managing our overall franchises, the dynamic of increasing supply of these franchises in the wholesale marketplace relative to having the supply of them on Digital and the relative balance between those factors are what drove some of the volatility this quarter.

103.     On this news, NIKE's Class B common stock fell almost 20%, from closing at $94.19 per share on June 27, 2024, to $75.37 per share on June 28, 2024.

**PAGE 33 – VERIFIED DERIVATIVE COMPLAINT**

**D.    Defendants' Misconduct Has and Continues to Harm the Company.**

104.    As a direct and proximate result of the Defendants' conduct, the Company has been harmed and will continue to be. The harm includes, but is not limited to, the costs already incurred and to be incurred defending the Company in the securities class action *In re Nike Inc. Securities Litigation*, Case No. 3:24-cv-00974-AN (D.Or.), as well as costs to be incurred in remediating deficiencies in the Company's internal controls.

105.    NIKE's reputation and goodwill have also been damaged by the Defendants' misconduct. After the Company's financial results for the fourth quarter and full year for fiscal year 2024 were released on June 27, 2024, analysts questioned the Company's long-term health. An analyst at Stifel stated that NIKE management's credibility was "severely challenged." The managing director at Global data stated: "Management has tried to sell a story of improvement to investors but is not prepared to back it up with positive forecasts."

**E.    NIKE Issues False and Misleading Proxy Statements.**

106.    In addition to the false and misleading statements discussed above, Defendants Benko, Cook, Donahoe, Duckett, Gil, Graf, M. Henry, P. Henry, Peluso, Knight, Parker, Rogers, and Swan also caused the Company to issue a false and misleading proxy statement during the Relevant Period. The Schedule 14A Proxy Statements issued on July 21, 2022, and July 20, 2023 (the "2022 and 2023 Proxies") that sought stockholder votes to, among other things, re-elect the Director Defendants to serve on the Board.

107.    The Director Defendants drafted, approved, reviewed, and/or signed the 2022 and 2023 Proxies before they were filed with the SEC and disseminated to NIKE's stockholders. The Director Defendants negligently issued materially misleading statements in the 2022 and 2023 Proxies. These allegations are based solely on negligence, they are not based on any allegations of

PATERNOSTER FARNELL & GREIN, LLP
Attorneys at Law
1030 SW Morrison Street
Portland, OR 97205
Telephone: (503) 222-1812  FAX: (503) 274-7979

recklessness or knowing conduct by or on behalf of the Director Defendants, and they do not allege

or do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any

allegation of, or reference or any allegation of fraud, scienter, or recklessness with regard to the

2022 and 2023 Proxies allegations and related claims.

108.    In support of re-electing themselves, the Director Defendants highlighted their

supposed oversight of the Company. The Proxy Statement filed with the SEC on July 21, 2022

stated:

> While the Company's management team is responsible for day-to-day management
> of the various risks facing the Company, the Board takes an active role in the
> oversight of the management of critical business risks. The Board does not view
> risk in isolation. Risks are considered in virtually every business decision and as
> part of NIKE's business strategy.
>
> *       *       *
>
> The **AUDIT & FINANCE COMMITTEE** oversees risks related to the
> Company's financial statements, the financial reporting process, accounting, legal
> matters, investments, access to capital and capital deployment, currency risk and
> hedging programs, information security (including risks related to cyber security),
> and data protection. The committee oversees the internal audit function, reviews a
> risk-based plan of internal audits, and reviews a risk-based integrated audit of
> internal controls over financial reporting. The committee meets separately with the
> Vice President of Global Audit and Chief Risk Officer, representatives of the
> independent registered public accountants, and senior management.

109.    The Proxy Statement filed with the SEC on July 20, 2023 stated:

> While the Company's management team is responsible for day-to-day management
> of the various risks facing the Company, the Board takes an active role in the
> oversight of the management of critical business risks. The Board does not view
> risk in isolation. Risks are considered in virtually every business decision and as
> part of NIKE's business strategy.
>
> *       *       *
>
> The **AUDIT & FINANCE COMMITTEE** oversees risks related to the
> Company's financial statements, the financial reporting process, accounting, legal
> matters, investments, access to capital and capital deployment, currency risk and

**PAGE 35 – VERIFIED DERIVATIVE COMPLAINT**

hedging programs, information security (including risks related to cyber security), and data protection. The committee oversees the internal audit function, reviews a risk-based plan of internal audits, and reviews a risk-based integrated audit of internal controls over financial reporting. The committee meets separately with the Vice President of Global Audit and Chief Risk Officer, representatives of the independent registered public accountants, and senior management.

110.    The 2022 and 2023 Proxies thus assured stockholders that the Director Defendants understood Company-wide risks, actively oversaw the Company's risks and exposures, and that steps were taken to monitor and mitigate risk exposures. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Defendants from causing the Company to make materially false and misleading statements concerning the sustainability of NIKE's direct-to-consumer strategy.

111.    As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to re-elect the Director Defendants to the Board.

**F.    The Board Breached its Fiduciary Duties.**

112.    As officers and/or directors of NIKE, the Defendants owed NIKE fiduciary duties of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage NIKE in a fair, just, honest and equitable manner. The conduct of the Director Defendants involves a knowing or reckless violation of their obligations as directors and officers of NIKE, the absence of good faith on their part, and a reckless disregard for their duties to the Company that Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

113.    Defendants, because of their positions of control and authority as directors and/or officers of NIKE, were able to and did exercise control over the wrongful acts complained of

**PAGE 36 – VERIFIED DERIVATIVE COMPLAINT**

herein. As officers and/or directors of a publicly traded company, the Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding NIKE's financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

114.    To discharge their duties, the officers and directors of NIKE were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors and NIKE were required to, among other things:

a.    Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the Company's stockholders;

b.    Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

d.    Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial

PATERNOSTER FARNELL & GREIN, LLP
Attorneys at Law
1030 SW Morrison Street
Portland, OR 97205
Telephone: (503) 222-1812  FAX: (503) 274-7979

controls such that the Company's financial reporting would be true and accurate at all times;

e.    Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

f.    Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

115.    The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

116.    The Board's Audit and Finance Committee is tasked with oversight of the Company's accounting, auditing, financial reporting, and internal controls. Specifically, according to the Audit and Finance Committee's charter, the Audit and Finance Committee's responsibilities include:

To review and discuss with management earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

*    *    *

To report regularly to the Board any material issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's

**PAGE 38 – VERIFIED DERIVATIVE COMPLAINT**

compliance with legal or regulatory requirements, the Company's risk assessment and management practices and policies, the performance and independence of the Company's independent auditor, or the performance of the internal audit function.

117.     In violation of the Audit and Finance Committee Charter, and their general duties as members of the Audit and Finance Committee, Defendants Benko, Connors, Graf, M. Henry, P. Henry and Swan, conducted little, if any, oversight of the Company's internal controls over financial reporting, resulting in materially false and misleading statements regarding the Company's business and consciously disregarded their duties to monitor such controls. The Audit and Finance Committee's complete failure to perform their duties in good faith resulted in misrepresentations to the public and the Company's stockholders.

118.     In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

119.     The Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their company's Audit and Finance Committee Charter have inflicted, and will continue to inflict, significant harm on NIKE.

PATERNOSTER FARNELL & GREIN, LLP
Attorneys at Law
1030 SW Morrison Street
Portland, OR 97205
Telephone: (503) 222-1812  FAX: (503) 274-7979

## DERIVATIVE ALLEGATIONS

120.    Plaintiff brings this action derivatively in the right and for the benefit of NIKE to redress injuries suffered by NIKE as a direct result of the Director Defendants' breaches of fiduciary duty.  NIKE is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

121.    Plaintiff will adequately and fairly represent the interests of NIKE in enforcing and prosecuting the Company's rights.

## DEMAND FUTILITY ALLEGATIONS

122.    Plaintiff repeats, re-alleges, and incorporates by reference each and every allegations set forth as though fully set forth herein.

123.    The NIKE Board currently has 13 members: Defendants Benko, Cook, Donahoe, Duckett, Gil, Graf, M. Henry, P. Henry, Knight, Parker, Peluso, Rogers, and Swan.

124.    Plaintiff has not made any demand on NIKE's current Board to institute this action against the Director Defendants, as any pre-suit demand would be excused. The Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

### A.    The Director Defendants Lack Independence Because They Face a Substantial Likelihood of Liability.

125.    As alleged above, the Director Defendants breached their fiduciary duties by negligently issuing the materially false and misleading 2022 and 2023 Proxies soliciting the reelection of themselves to the Board. Accordingly, the Director Defendants face a substantial likelihood of negligence liability for issuing the 2022 and 2023 Proxies and any demand upon these defendants is therefore futile.

**PAGE 40 – VERIFIED DERIVATIVE COMPLAINT**

126.    The Director Defendants also face a substantial likelihood of liability for their individual misconduct. As alleged above, the Director Defendants breached their fiduciary duties by allowing the Company to issue the materially false and misleading statements described above. The Director Defendants had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.

127.    In addition, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, the Director Defendants knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of NIKE.

128.    The Director Defendants' making or authorization of these false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required due diligence constitute breaches of fiduciary duties that have resulted in the Director Defendants facing a substantial likelihood of liability. If the Director Defendants were to bring a suit on behalf of NIKE to recover damages sustained as a result of this misconduct, they would expose themselves and their colleagues to significant liability. For this reason, demand is futile as to the Director

PATERNOSTER FARNELL & GREIN, LLP
Attorneys at Law
1030 SW Morrison Street
Portland, OR 97205
Telephone: (503) 222-1812  FAX: (503) 274-7979

Defendants.

**B.    Defendants Donahoe, Knight and Parker are not Independent.**

129.    Defendant Knight is the son of NIKE's co-founder, who received compensation in excess of the threshold set forth in applicable NYSE rules. Defendant Knight also has a significant role in the management of the Class A stock owned by Swoosh, LLC. Swoosh, LLC owns 77.5% of NIKE's Class A stock, and 16.1% of the Class B stock. The Travis A. Knight 2009 Irrevocable Trust II, of which Defendant Knight is a beneficiary, owns 11.7% of NIKE's Class A stock, and 2.8% of the Class B stock. As NIKE explained in the Schedule 14A Proxy Statement filed with the SEC on July 25, 2024:

> The shares of Class A Stock and Class B Stock have identical voting and economic rights except that the holders of the Class A Stock and Class B Stock vote as separate classes for purposes of electing directors. Specifically, for as long as the number of outstanding shares of Class B Stock is between 25% and 87.5% of the total number of outstanding shares of Common Stock (as is currently the case), the holders of the Class B Stock, voting as a separate class, have the right to elect 25% of the Board (rounded up to the nearest whole number) and the holders of the Class A Stock, voting as a separate class, have the right to elect the remaining directors. . . .The Class A Stock is currently primarily held by Swoosh, LLC, an entity that was formed by Mr. Philip Knight, NIKE's co-founder, in 2015 to hold the majority of his shares of Class A Stock.

NIKE stated in the same Proxy Statement that Defendant Knight is not independent pursuant to NYSE rules.

130.    Defendants Donahoe and Parker are executive officers and currently are employed by NIKE. Defendant Parker currently serves as Executive Chairman. Previously, Defendant Parker served as President and CEO of NIKE from 2006 to 2020 and has been employed by NIKE since 1979. Defendant Parker received compensation of $8 million in 2024, $9.9 million in 2023, and $11.8 million in 2022. Defendant Donahoe has served as President and CEO since 2020. Defendant Donahoe received compensation of $29.1 million in 2024, $32.7 million in 2023 and $28.8 million

**PAGE 42 – VERIFIED DERIVATIVE COMPLAINT**

in 2022. Both Defendants Donahoe and Parker depend on NIKE for their income. In addition, NIKE stated in the Schedule 14A Proxy Statement filed with the SEC on July 25, 2024, that Defendants Donahoe and Parker are not independent pursuant to NYSE rules.

     **C.**    **Defendants Benko, Graf, M. Henry, P. Henry, and Swan are not Disinterested Because They Were Members of the Audit and Finance Committee.**

     131.    NIKE states that some of the purposes of Audit and Finance Committee include assisting the Board in fulfilling its duties concerning "activities of the Company that may have a material impact on the Company's financial position" and the Company's "compliance with legal and regulatory requirements. One of the Audit and Finance Committee's responsibilities is to review the Company's earnings press releases in connection and financial information and earnings guidance provided to investors and analysts. The Audit and Finance Committee was thus responsible for reviewing and approving NIKE's earnings releases, which include the press releases and statements made in calls with analysts and investors between March 19, 2021, and December 21, 2023. Defendants Benko, Graf, M. Henry, P. Henry, and Swan were members of the Audit and Finance Committee during the relevant time period and were thus responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Through their knowledge or reckless disregard, Defendants Benko, Graf, M. Henry, P. Henry, and Swan caused improper statements by the Company. Accordingly, Defendants Benko, Graf, M. Henry, P. Henry, and Swan breached their fiduciary duty of loyalty and good faith because they participated in the misconduct described above. They face a substantial likelihood of liability for these breaches, making any demand on them futile.

     132.    Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will

**PAGE 43 – VERIFIED DERIVATIVE COMPLAINT**

be able to prove that these individuals breached their fiduciary duties by condoning the misconduct and failing to take meaningful action to remedy the resultant harm.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### (Derivatively Against The Director Defendants)

133.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

134.    Each of the Defendants owed and owes NIKE the highest obligations of loyalty, good faith, due care, and oversight.

135.    Each of the Defendants violated and breached their fiduciary duties of loyalty, good faith, candor and oversight to the Company.

136.    The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

137.    In addition, the Director Defendants further breached their fiduciary duties owed to NIKE by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations and failure to disclose that NIKE's Consumer Direct Acceleration strategy was not sustainable and would not sustain the gross margins promised to investors and analysts. The Director Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and

**PAGE 44 – VERIFIED DERIVATIVE COMPLAINT**

misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary duties.

138.    The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

139.    As a direct and proximate result of the breaches of duty alleged herein, NIKE has sustained and will sustain significant damages.

140.    As a result of the misconduct alleged herein, these Defendants are liable to the Company.

141.    Plaintiff, on behalf of NIKE, has no adequate remedy at law.

### COUNT II
### Breach of Fiduciary Duty
### (Derivatively Against the Officer Defendants)

142.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

143.    Defendants Donahoe and Friend are executive officers of the Company. As executive officers, Defendants Donahoe and Friend owed and owe NIKE the highest obligations

**PAGE 45 – VERIFIED DERIVATIVE COMPLAINT**

of loyalty, good faith, due care, oversight, and candor.

144.    Defendants Donahoe and Friend breached their fiduciary duties owed to NIKE by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact, failing to disclose that NIKE's Consumer Direct Acceleration strategy was not sustainable and would not sustain the gross margins promised to investors and analysts. Defendants Donahoe and Friend failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact.

145.    As a direct and proximate result of the breaches of duty alleged herein, NIKE has sustained and will sustain significant damages.

146.    As a result of the misconduct alleged herein, Defendants Donahoe and Friend are liable to the Company.

147.    Plaintiff, on behalf of NIKE, has no adequate remedy at law.

## COUNT III
## Violation of Section 14(a) of the Exchange Act
## (Against the Director Defendants)

148.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

149.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

PATERNOSTER FARNELL & GREIN, LLP
Attorneys at Law
1030 SW Morrison Street
Portland, OR 97205
Telephone: (503) 222-1812  FAX: (503) 274-7979

150.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2022 and 2023 Proxies. In the 2022 and 2023 Proxies, the Board solicited stockholder votes to reelect the Director Defendants to the Board.

151.    The 2022 and 2023 Proxies, however, misrepresented and failed to disclose the Board's risk oversight and the Company's inadequate internal controls, which facilitated the illegal behavior described herein. By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, NIKE misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect Director Defendants.

152.    Plaintiff, on behalf of NIKE, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2022 and 2023 Proxies in connection with the improper reelection of Director Defendants to the Board.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of NIKE and that Plaintiff is a proper and adequate representative of the Company;

B.    Against all of the Defendants and in favor of NIKE for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C.    Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

**PAGE 47 – VERIFIED DERIVATIVE COMPLAINT**

D.      Awarding NIKE restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: September 13, 2024

PATERNOSTER, FARNELL & GREIN, LLP

By:  *s/ Charles J. Paternoster*
Charles J. Paternoster, OSB No. 024186
1030 S.W. Morrison Street
Portland, OR 97205
Phone: (503) 222-1812
Email: CPaternoster@pfglaw.com

and

ROWLEY LAW PLLC
Shane T. Rowley, Esq.
*Pro Hac Vice Admission to be filed*
Danielle Rowland Lindahl, Esq.
*Pro Hac Vice Admission to be filed*
50 Main Street, Suite 1000
White Plains, New York 10606
Phone: (914) 400-1920
Fax: (914) 301-3514
Email: srowley@rowleylawpllc.com
drl@rowleylawpllc.com

**PAGE 48 – VERIFIED DERIVATIVE COMPLAINT**